**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

COMMODITY FUTURES TRADING
COMMISSION,

      Plaintiff,

v.                                                            Case No. 6:20-cv-652-WWB-EJK

FINTECH INVESTMENT GROUP, INC.,
COMPCOIN LLC and ALAN
FRIEDLAND,

      Defendants.
_____/

## ORDER

THIS CAUSE is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 53), Defendants' Response in Opposition (Doc. 59), and Plaintiff's Reply (Doc. 62). However, Defendants' Response in Opposition was not timely filed, (*see* Doc. 56), and fails to comply with Local Rule 3.01(b) and this Court's January 13, 2021 Standing Order. Therefore, the Response in Opposition will be stricken and will not be considered by this Court. For the reasons set forth below, Plaintiff's Motion will be denied.

**I.    BACKGROUND[1]**

Defendant Alan Friedland is the founder and sole owner of Defendants Fintech Investment Group, Inc. ("**Fintech**") and Compcoin LLC (collectively, "**Defendants**"). (Doc 1, ¶ 11; Doc. 22, ¶ 11). Friedland controlled and directed the activities of Fintech and Compcoin LLC. (Doc 1, ¶ 11; Doc. 22, ¶ 11). Fintech, from its establishment as a

---

[1] Pursuant to Federal Rule of Civil Procedure 56(e), this Court will consider the facts set forth in Plaintiff's Motion undisputed for the purpose of resolving the pending Motion.

corporation in March 2016 to its dissolution in September 2019, was registered with Plaintiff, the Commodity Futures Trading Commission ("**CFTC**"), as a commodity trading advisor ("**CTA**"). (Doc 1, ¶ 12; Doc. 22, ¶ 12). Friedland also was registered with the CFTC as an associated person of Fintech and listed as its principal. (Doc 1, ¶ 11; Doc. 22, ¶ 11). Compcoin LLC, formed in June 2015 and dissolved in September 2019, was never registered with the CFTC. (Doc. 1, ¶ 13; Doc. 22, ¶ 13). Compcoin LLC marketed and sold a digital asset called Compcoin, which offered investors access to ART, Fintech's foreign exchange ("**forex**") trading program. (Doc. 53-2 at 2–27; *see also* Doc. 53-3). In their advertisements and marketing, Defendants represented that Fintech, as a National Futures Association ("**NFA**") member and licensed CTA, operated Compcoin LLC and managed ART. (Doc. 53-6 at 2; Doc. 53-7 at 2; Doc. 53-10 at 12; Doc. 53-46 at 101:15–24). Friedland explained the relationship between Compcoin, ART, and Fintech as follows: "Compcoin controlled access to the A[RT] trading program and Fintech was going to run the trading program." (Doc. 53-46 at 65:16–18).

Defendants marketed Compcoin as a "digital asset" distinct from cryptocurrency because it did not hold an equivalent value in real currency or act as a substitute for real currency. (Doc. 53-2 at 7, 22; Doc. 53-3 at 11). Rather, Compcoin LLC's website explained that "Compcoin ha[d] an intrinsic value that [wa]s based upon the quarterly cash returns of its investment technology." (Doc. 53-3 at 34). Compcoin promotional materials, including its white paper advertisement and a paid press release,[2] provided

---

[2] The press release, published by PR Newswire on May 17, 2017, contained the following headline: "Fintech Investment Group Launches With A.I. Forex Trading Platform And Compcoin Digital Tokens Ahead Of Initial Coin Offering." (Doc. 53-21 at 2). At some point, the press release was also displayed on Fintech's website. (Doc. 53-22 at 2).

that "the primary function of Compcoin [wa]s to grant investors access to ART – a proprietary, automated, algorithmic foreign currency exchange (forex) trading platform developed by [Fintech]." (Doc. 53-2 at 6; Doc. 53-21 at 2). In fact, ART was accessible exclusively with Compcoins, which could be purchased directly from Compcoin LLC or by trading digital currency on an exchange. (Doc. 53-2 at 17; Doc. 53-3 at 9, 26, 42; Doc. 53-9 at 150:21–24).

Compcoin LLC's website advertised ART as a "trading platform . . . [that] [a]utomatically executes and manages foreign currency trades." (Doc. 53-3 at 37). The website also boasted, "[r]eported results . . . on par with other auto-trading algorithms used by large hedge funds unavailable to most investors" and that ART was "[c]utting-edge trading technology [that] levels the investing playing field by granting access to advanced trading technologies once available exclusively to elite investors[.]" (*Id.* at 36–37). Compcoin LLC's white paper further advertised that "ART's high success rate at predicting USD/EUR forex trades, coupled with the high rate of return from these trades, will stimulate demand among investors and forex traders to purchase and use Compcoin – specifically to gain access to ART." (Doc. 53-2 at 7). The white paper indicated that Compcoin's founders felt that ART "was ready for release on the open market." (*Id.*). Friedland was also quoted in a paid press release stating, "After eight years of testing, which resulted in highly successful predictions and high returns, we believe Compcoin is ready to generate profits for forex traders on the open market." (Doc. 53-23 at 3–4).

From 2016 to 2018, Compcoin LLC raised approximately $1.6 or $1.7 million by selling Compcoins, including through its Initial Coin Offering ("**ICO**") in June 2017. (Doc. 53-9 at 128:12–129:16). Many Compcoin purchasers testified that they purchased

3

Compcoins, at least in part, to utilize ART for forex trading. (Doc. 53-11 at 23:10–11; Doc. 53-12 at 35:3–9; Doc. 53-13 at 29:7–18). However, as of April 2021, none of the Compcoin purchasers had received access to ART. (Doc. 53-9 at 118:4–17). Shortly after the ICO, Fintech sought NFA approval of its required disclosure document to solicit clients to trade forex using ART. (Doc. 53-28 at 2); *see also* 17 C.F.R. § 4.31 (requiring CTAs to provide to a prospective client a disclosure document before entering into an agreement to direct or guide the client's commodity interest account). Fintech submitted modified versions of its disclosure document for NFA approval at least eight times from August 2017 to April 2018 but never received approval. (Doc. 53-14 at 52:16–20; *see generally* Doc. Nos. 53-24, 53-28, 53-29, 53-30, 53-31, 53-32, 53-33, 53-34). NFA also communicated with Friedland by telephone regarding his business ventures. (*See, e.g.*, Doc. 53-9 at 119:19–120:14; Doc. 53-14 at 38:18–25). At some point between 2016 and 2018, Compcoin was listed on at least one digital asset exchange, but by mid-2018, Compcoin was delisted by all exchanges. (Doc. 53-9 at 188:9–19; *see also* Doc. 53-10 at 13; Doc. 53-45 at 2).

## II.   LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material

fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

"If a party . . . fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). However, "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Mia., Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). "At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment," and "must ensure that the motion itself is supported by evidentiary materials." *Id.* at 1101–02.

### III. DISCUSSION

The CFTC brought a seven-count civil enforcement action against Defendants alleging violations of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("**CEA**") and its accompanying regulations, 17 C.F.R. § 1.1 *et seq.* The CFTC seeks summary judgment as to liability on all seven counts.

#### A.   Counts I and IV: Fraud

The CFTC alleges that Defendants committed fraud in violation of 7 U.S.C. §§ 6b and 9, and their corresponding regulations, 17 C.F.R. §§ 5.2(b), 180.1, by making material misrepresentations and omissions to potential investors. "[T]he CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002). Section 6b makes it "unlawful . . . for any person . . . in connection with . . . any contract of sale of any commodity for future delivery . . . to cheat or defraud or attempt to cheat or defraud the other person . . . [or] willfully to make or cause to be made . . . any false report or statement . . . [or] willfully to deceive or attempt to deceive the other person by any means whatsoever." 7 U.S.C. § 6b(a)(2)(A)–(C); *see also* 17 C.F.R. § 5.2(b) (applying the same to retail forex transactions). Similarly, § 9 makes it "unlawful for any person . . . to use . . . in connection with any . . . contract of sale of any commodity in interstate commerce . . . for future delivery . . . any manipulative or deceptive device or contrivance[.]" 7 U.S.C. § 9(1); *see also* 17 C.F.R. § 180.1(a)(1)–(3) (making it "unlawful for any person . . . in connection with any . . . contract of sale of any commodity in interstate commerce . . . or contract for future delivery . . . to intentionally

6

or recklessly . . . use . . . any manipulative device, scheme, or artifice to defraud; . . . [or] [m]ake . . . any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; . . . [or] [e]ngage . . . in any act . . . which operates . . . as a fraud or deceit upon any person").

"To establish that Defendants committed fraud in violation of the CEA, CFTC must prove: (1) that Defendants made a misrepresentation, misleading statement, or deceptive omission; (2) with scienter; and (3) the misrepresentation, misleading statement, or omission was material." *U.S. Commodity Futures Trading Comm'n v. Allied Mkts. LLC*, 371 F. Supp. 3d 1035, 1047 (M.D. Fla. 2019); *see also U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018) (holding that 7 U.S.C. §§ 6b(a), 9, and 17 C.F.R. § 180.1 are "redundant" because they require proof of the same elements).

In their Motion, the CFTC argues that Defendants made the following misrepresentations: (1) that by purchasing Compcoins, investors would have access to Fintech's cutting-edge forex trading platform, ART, but failing to disclose the NFA had not approved Fintech's disclosure document, which was required for investors to use ART to trade forex; and (2) boasting of ART's "high success rate" and "high returns" without disclosing that, as Friedland admitted, these statements were based on hypothetical testing, not actual performance by ART. However, the CFTC only argues that scienter has been established with respect to the first purported misrepresentation. Therefore, because the CFTC must prove each of the three elements is met with respect to a specific misrepresentation, statement, or omission, this Court will limit its discussion to whether

7

Defendants' statements regarding the availability of ART are sufficient to establish a violation of the relevant statutes and regulations.

"Whether a misrepresentation has been made depends on the overall message and the common understanding of the information conveyed." *R.J. Fitzgerald & Co.*, 310 F.3d at 1328 (quotation omitted). Having reviewed the record and the evidence cited by the CFTC, this Court is not satisfied that the CFTC has established that it is entitled to summary judgment as to the first element. Specifically, contrary to the CFTC's arguments, it has not directed this Court to any record evidence that Defendants represented that "customers could access ART" at the time they purchased Compcoin. (Doc. 53 at 20). Rather, Defendants stated on multiple occasions, that they believed that ART "was ready for release on the open market." (Doc. 53-2 at 7; Doc. 53-23 at 3–4). Additionally, there is evidence that Defendants told purchasers that they anticipated releasing ART once they received the necessary approval, "which [they] anticipate[d] in the coming days." (Doc. 53-11 at 49:18–50:8; Doc. 53-42 at 2). There is no dispute that Defendants were, at that time, actively seeking NFA approval for ART and the CFTC has not shown that Defendants knew or should have known that approval was not likely to be granted. Considering the overall messages that were being conveyed and applying common sense, there is, at least, a question of fact regarding whether such statements were misrepresentations, misleading, or material omissions.

Moreover, even if the CFTC had presented evidence that the statements were misleading, it has fallen short of establishing the element of scienter. "[S]cienter is established if Defendant[s] intended to defraud, manipulate, or deceive, or if Defendant[s'] conduct represents an extreme departure from the standards of ordinary care." *R.J.*

8

*Fitzgerald & Co.*, 310 F.3d at 1328. "A showing of severe recklessness satisfies the scienter requirement. . . . Severe recklessness is limited to those highly unreasonable omissions or misrepresentations . . . that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Allied Mkts.*, 371 F. Supp. 3d at 1049 (quotation omitted). The CFTC argues that Defendants acted with scienter by making statements representing that the purchase of Compcoin would grant the buyer access to ART, which was represented as ready or nearly ready to launch. However, the evidence relied on by the CFTC fails to show that Defendants knew, or reasonably should have known, that approval was not likely to be granted in the near future and that ART was not close to being released for use. Thus, there remains at least a material issue of fact regarding the existence of scienter as well. Accordingly, the CFTC has not shown entitlement to summary judgment with respect to Counts I and IV.

    **B.**    **Counts II and V: Fraud by a CTA**

The CFTC also alleges that Fintech and Friedland committed fraud in violation of 7 U.S.C. § 6*o* and 17 C.F.R. § 4.41(a). Section 6*o* makes it "unlawful for a commodity trading advisor . . . [or] associated person of a commodity trading advisor, . . . by use of the mails or any means or instrumentality of interstate commerce . . . to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant." 7 U.S.C. § 6*o*(1)(A)–(B). Similarly, § 4.41(a), in relevant part, prohibits CTAs and principals from advertising in a way that "[e]mploys any device, scheme or artifice to

9

defraud any participant or client or prospective client; [or] . . . [i]nvolves any transaction, practice or course of business which operates as a fraud or deceit upon any participant or client or any prospective participant or client." 17 C.F.R. § 4.41(a). The requirements for a fraud claim under 7 U.S.C. § 6*o* are basically the same as those for a fraud claim under 7 U.S.C. § 6b. *Allied Mkts.*, 371 F. Supp. 3d at 1050 (citation omitted). However, courts have held that 7 U.S.C. § 6*o*(1)(B) and 17 C.F.R. § 4.41(a)(2) do not require proof of scienter. *Id.* n.15.

The CFTC relies on the same alleged misrepresentations as it did with respect to Counts I and IV. First, the CFTC argues that Defendants' representations that purchasing Compcoins would grant investors access to ART without disclosing that the NFA had not approved Fintech's disclosure document was an actionable misrepresentation. However, for the reasons set forth above, material issues of fact preclude summary judgment as to such statements.

Second, the CFTC argues that Fintech and Friedland violated the relevant statutes and regulations by stating that ART had a "high success rate" and "high returns" without disclosing that these statements were based on hypothetical testing, not actual performance by ART. The statements relied on by the CFTC appeared on the Compcoin LLC website, (Doc. 53-2 at 7, 11–12), and a June 2017 press release paid for by Compcoin LLC, (Doc. 53-23 at 3–4). Unlike the May 17, 2017 press release, there is no evidence that the June 2017 press release ever appeared on the Fintech website. (*See* Doc. 53-22 at 2).

The statutes and regulations the CFTC argues that Fintech and Friedland violated only apply to CTAs and principals or associated persons of CTAs. *See* 7 U.S.C. § 6*o*(1);

10

17 C.F.R. § 4.41(a). Nevertheless, the CFTC has failed to direct this Court to any evidence that either Fintech or Friedland, acting in his role as an associated person or principal of Fintech, made any statements regarding ART's returns that failed to properly disclose the numbers were not based on actual results. It is undisputed that Compcoin LLC, who is responsible for the statements, is not a CTA and, therefore, cannot be held liable under the statute. The CFTC has also not directed this Court to any authority for the proposition that Friedland can be held liable for statements made on behalf of a non-CTA simply because he is an associated person or principal of a different CTA. Moreover, the CFTC has failed to sufficiently establish any other legal basis to impute Compcoin LLC's statements to Fintech or Friedland. Accordingly, the CFTC has also not shown entitlement to summary judgment with respect to Counts II and V.

   **C.**  **Counts III and VII: Aiding and Abetting**

In Counts III and VII, the CFTC alleges that Compcoin LLC aided and abetted Fintech and Friedland in committing the frauds alleged in Counts II and V. Pursuant to 7 U.S.C. § 13c(a), a person is liable for aiding and abetting if he "willfully aids, abets, counsels, commands, induces, or procures the commission of . . . a violation of any of the provisions of [the CEA], or any of the rules, regulations, or orders issued pursuant to [the CEA]." However, as set forth above, the CFTC has not established that a violation occurred, and therefore, it has also failed to establish that it is entitled to summary judgment with respect to its claims for aiding and abetting.

11

### D. Count VI: Failure to Include Proper Disclaimer

The CFTC alleges that Defendants' statements regarding ART's results and performance should have contained a specific disclaimer, as required under 17 C.F.R. § 4.41(b), regarding hypothetical trading results. The relevant regulation states that:

> No person may present the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest or series of transactions in a commodity interest of a commodity pool operator, commodity trading advisor, or any principal thereof, unless such performance is accompanied by one of the following:
>
> (i) The following statement: "These results are based on simulated or hypothetical performance results that have certain inherent limitations. Unlike the results shown in an actual performance record, these results do not represent actual trading. Also, because these trades have not actually been executed, these results may have under-or over-compensated for the impact, if any, of certain market factors, such as lack of liquidity. Simulated or hypothetical trading programs in general are also subject to the fact that they are designed with the benefit of hindsight. No representation is being made that any account will or is likely to achieve profits or losses similar to these being shown."; or
>
> (ii) A statement prescribed pursuant to rules promulgated by a registered futures association pursuant to section 17(j) of the Act.

17 C.F.R. § 4.41(b)(1).

The CFTC alleges Defendants violated this regulation through Compcoin LLC's white paper advertisement and advertisements listing specific rates of return for ART which were both posted on Compcoin LLC's website. The white paper advertisement stated in relevant part, "In eight years of controlled lab testing, Compcoin delivered an average 10%* quarterly return on investment (ROI) – much higher than the ROI of most retail and institutional forex traders." (Doc. 53-2 at 12–13). It was accompanied by the following footnote, which read in smaller print, "NOTE: Preliminary performance results were primarily achieved in a controlled environment using historical trading data measured against actual forex trading results. It is important to note past results are not

an indicator of future performance." (*Id.* at 12). Additionally, Compcoin LLC's website advertised historical rates of return for ART. A webpage titled "Predictive Intelligence" provided, "As an example, below show an objective look at the ART program predictive intelligence output. This research data shows the return potential and draw-downs possible with Compcoin technology." (Doc. 53-3 at 43). Readers were then presented with quarterly rates for the years 2008 to 2015, which were prominently displayed. (*Id.* at 43–45).

These statements, however, were only made on Compcoin LLC's website. There is no evidence in the record that either the Compcoin LLC white paper or the historical rates of return for ART were included on Fintech's website or otherwise made by Friedland in his role as a principal of Fintech. Again, the CFTC has failed to state a legal basis to impute Compcoin LLC's statements to Fintech or Friedland acting in his role as a principal of Fintech. Thus, the CFTC has failed to establish liability with respect to either Fintech or Friedland.

To the extent the CFTC seeks to impose liability on Compcoin LLC, it is also far from clear to this Court that Compcoin LLC may be held liable under § 4.41. Although the relevant subsection prohibits *any person* from making the relevant representations without the proper disclosure, the regulation at least nominally applies only to "[a]dvertising by commodity pool operators, commodity trading advisors, and the principals thereof[,]" and relates to 7 U.S.C. § 6*o*, which is explicitly aimed at the regulation of CTAs. 17 C.F.R. § 4.41; *see also* 7 U.S.C. § 6*o*. Accordingly, it is not clear that the regulation applies to the actions of Compcoin LLC, and the CFTC has failed to state any legal basis for so applying it. If, in the alternative, the CFTC is arguing that Compcoin LLC

13

is liable for making the representations on behalf of Fintech, the CFTC has failed to direct this Court to any evidence supporting its argument. Therefore, the CFTC has failed to meet its burden in showing that § 4.41(b) applies to the statements made by Compcoin LLC, and summary judgment must be denied with respect to Count VI as well.

IV. **CONCLUSION**

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Response in Opposition (Doc. 59) is **STRICKEN**.
2. Plaintiff's Motion for Summary Judgment (Doc. 53) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on December 14, 2021.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

14